[Cite as *State v. Sandifur*, 2024-Ohio-2414.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio/City of Sylvania                    Court of Appeals No.  L-23-1032

     Appellee                                   Trial Court No.  TRC2200170

v.

Cameron W. Sandifur                              **DECISION AND JUDGMENT**

     Appellant                                  Decided:  June 25, 2024

* * * * *

Heather L. Pentycofe, City of Sylvania Prosecuting Attorney, and
Jeffrey Lingo, Assistant Prosecuting Attorney, for appellee.

Adam H. Houser, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Cameron Sandifur, appeals the January 13, 2023 judgment of the

Sylvania Municipal Court sentencing him for misdemeanor convictions of operating a

vehicle while under the influence ("OVI") and failure to control.  For the following

reasons, we affirm.

# I. Background and Facts

{¶ 2} Sandifur was charged with one count each of OVI in violation of R.C. 4511.19(A)(1)(a), a first-degree misdemeanor, operating a motor vehicle without being in control of it in violation of R.C. 4511.202, a minor misdemeanor, and failure to stop after an accident on a public roadway in violation of R.C. 4549.02, a first-degree misdemeanor.[1]  The following facts were adduced at the August 29, 2022 bench trial.

{¶ 3} Trooper Ted Bergeron of the Ohio State Highway Patrol ("OSHP") testified that he was dispatched around 8:00 p.m. on January 14, 2022, to investigate "an injury crash that apparently the person involved was fleeing the scene."  When he arrived at the scene, he saw a Ford pickup truck with "heavy damage done to it . . ." that was "smashed up against" a large, decorative stone landscaping wall.  The truck had also hit a light post. The truck was empty and not running; Bergeron could not recall if the keys were in the truck.  Although it was January, Bergeron did not recall any ice or snow on the roads, and believed that the roads were clear that day.  Another officer at the scene told him that a nearby resident had seen the driver and his wife and "they had left the scene."  Bergeron

---

[1] There does not appear to be a charging instrument for the failure-to-stop violation in the record.  The traffic citation (which is in the file, but not file stamped) says that the "TOTAL # OFFENSES" is three, but only lists two Revised Code sections (R.C. 4511.19(A)(1)(a) for the OVI charge and R.C. 4511.202 for the failure-to-control charge).  The only reference to Sandifur being charged with failure to stop (outside of the court and parties referring to this charge on the record) is a note in Bergeron's traffic crash report that Sandifur was charged with "hit skip (4549.02)[.]"  The trial court acquitted Sandifur of this charge, and he does not raise any issues regarding it, so we will not address it further.

2.

ran the truck's license plate and learned that it was registered to an address "right around the corner. We were out in front of a subdivision of where the address was."

{¶ 4} Bergeron went to the address on the truck's registration, where a woman answered the door. According to Bergeron, she seemed "distraught and upset," and was talking on the phone. He asked for Cameron Sandifur because that was the name on the truck's registration.

{¶ 5} When Sandifur came to the door, Bergeron noticed that "he looked very disheveled, he had blood on his hands, had a laceration to his forehead that was bleeding . . . [and] had red, bloodshot, glassy eyes." Bergeron did not recall what clothing Sandifur was wearing, but remembered that he looked like he "had been through a crash, looked disheveled." As Bergeron recalled their conversation, "I said well, I hear about the crash you were involved in last night—or you were just involved in. And [Sandifur] said, ah, he said to me I don't remember. And I said you don't remember the crash you were involved in? And he said I don't remember anything."

{¶ 6} After that, Bergeron asked Sandifur to get his license and insurance information. Sandifur closed the door, and when he came back with the documents, he told Bergeron that his truck was stolen from Bunker Bar around 5:30 p.m. Bergeron gave him a statement form to fill out, which Sandifur completed while he was in the house with the door closed. When Sandifur returned the statement form, he had written that he "checked [the] drive to see all of our vehicle where [sic] in place and [his] truck was missing." Two sentences later, he wrote that he woke up due to "the police knocking on

3.

[his] door" and saw that his truck was gone after opening the garage. He noted that his keys were also missing.

{¶ 7} Bergeron noticed right away that Sandifur's written statement did not match what he initially said about the truck being stolen from Bunker Bar at 5:30 p.m. Bergeron recorded his follow-up questions and Sandifur's answers on the statement form. According to these notes, Sandifur said that the truck went missing at 8:30 p.m. while he was at home. He also said that the truck went missing from Bunker Bar around 5:30 p.m. When pressed, Sandifur settled on Bunker Bar as location his truck was stolen from. He said that he was at Bunker Bar from approximately 2:30 p.m. to 5:30 p.m., at which point he found that his truck was missing and had to call his wife to pick him up. He said that he had not filed a police report regarding the stolen truck because he had just discovered that it was missing.

{¶ 8} While he was talking to Sandifur, Bergeron noticed "a strong odor of alcoholic beverage coming off him, his breath, . . ." his speech was slurred, and he was "kind of staggering a little bit and swaying as he spoke . . . ." He asked Sandifur to leave the house, but Sandifur refused. Because Sandifur was inside his home, Bergeron did not perform any field sobriety tests or attempt to obtain a chemical test. The only explanation Sandifur gave for the cut on his forehead was that he "tripped."

{¶ 9} On cross-examination, Bergeron said that he asked Sandifur if he needed an ambulance, and said it was "possible" that Sandifur could have hit his head in the accident and gotten a concussion or had difficultly remembering things. He believed that Sandifur was driving the truck when it crashed based on the injury that Sandifur could

4.

not satisfactorily explain and because "it looked like he had just been through a car crash . . . ." Bergeron reiterated that he did not do field sobriety tests because Sandifur was inside of his house, but later admitted that Sandifur came out of the house to give Bergeron his written statement. However, Bergeron did not attempt field sobriety tests or offer a breathalyzer test, despite Sandifur being outside of his house, because he does not "press things when they're at their house." Although Bergeron claimed that he "verbal[ly]" offered Sandifur a breathalyzer test, he did not have any signed paperwork saying that Sandifur refused either chemical or field sobriety tests.

{¶ 10} Despite the lack of testing, Bergeron believed that Sandifur was impaired based on the odor of alcohol that he smelled while standing two or three feet away from Sandifur, the appearance of Sandifur's eyes, and Sandifur swaying and stumbling. Based on his training and experience as a police officer, Bergeron knew that highly intoxicated people exhibit the same behaviors that Sandifur exhibited that night, and, although he conceded that the same behaviors could be caused by "any number of things," he believed that Sandifur's behavior indicated intoxication. And he assumed, based on Sandifur appearing highly intoxicated at his house and the short time since the crash, that Sandifur was also "highly intoxicated when the crash happened."

{¶ 11} When Bergeron finished speaking with Sandifur, he went back to the scene of the crash. He said that it was "quite a process" to have the truck towed because an axle was torn off or a tire was missing, which made it difficult for the tow truck driver to remove the truck from on top of the landscaping wall. While he was waiting for the truck

5.

to be towed, Bergeron went to nearby condominiums to try to find the witness the first officers on the scene told him about. He eventually found Lisa Hurley.

{¶ 12} Hurley testified that she was watching TV around 8:00 p.m. on January 14, 2022, when she heard a "loud screeching." Although she looked, she did not see anything outside and noticed that traffic was still moving. She did not recall any snow on the ground that night.

{¶ 13} A few minutes later, she walked out to her patio and saw two people walking down the road. She asked them if everything was okay, and as they walked toward her fence, she saw that the man had blood on him. Hurley offered to call an ambulance, but the man said that he was fine. The woman with him said that she was a nurse and intended to check his eyes with a light to determine if he needed to go to the emergency room. Hurley saw the man wipe at some blood with his hand, but, although she saw the man touch her fence after wiping the blood, officers did not find blood on the fence.

{¶ 14} An hour or so after Hurley talked to these people, a woman came to her door and took her to the crash site, which was approximately 50 feet from her condo. When she got there, she saw a light-colored pickup truck that had crashed. The people she spoke to were walking from the direction of crash, and she talked to them "within five minutes" of hearing the screeching noise.

{¶ 15} Hurley was not able to identify Sandifur as the man she saw walking that night, but said that the man told her that "he lived across the street at the subdivision across the street, they lived close."

6.

{¶ 16} On cross, Hurley said that she was probably eight to ten feet away from the couple when she spoke to them, and the interaction lasted two or three minutes. She did not smell any alcohol on the man, did not notice the man slurring his speech, and did not see the man stumbling. However, she qualified her testimony by saying that she did not think she was close enough to smell alcohol, she "mostly talked to" the woman, and she could not "see well [because] we have a lattice fence and you can't really see well through it." She did not know, based on her brief interaction with the man, whether he was intoxicated; she was primarily concerned with the man's well-being and determining whether he needed an ambulance, was not looking for signs of impairment while talking to him, and had no training regarding signs of intoxication.

{¶ 17} Two days after the accident, Bergeron asked Michael Hakeos Jr., of the investigative unit of the Ohio Department of Public Safety, to check Bunker Bar for surveillance video showing Sandifur's truck being stolen.

{¶ 18} Hakeos explained that investigating alcohol violations is part of his job. Bergeron contacted him about the January 14 accident to see if Hakeos could determine whether a truck was stolen from Bunker Bar that day, identify any potential suspects, or determine if the truck's owner drove it from the bar.

{¶ 19} Hakeos went to Bunker Bar and asked for receipts and video footage from January 14. He was able to get copies of all of the surveillance footage, but could not get receipts because Sandifur paid in cash that night. Once he had the video, Hakeos found the time when Sandifur drove into the parking lot in his truck and watched Sandifur on the different cameras until he left the bar. Hakeos knew what vehicle to look for based

7.

on police reports, and said that bar staff identified Sandifur. He created a timeline detailing each action Sandifur took over the course of the evening, the time it occurred, and the camera that recorded it.

{¶ 20} Based on the video, Hakeos determined that Sandifur arrived at Bunker Bar at 2:37 p.m. While he was there, he consumed a total of eight beers consisting of five draft beers that were 16 to 24 ounces each and three bottled beers that were 12 ounces each. He could not give a specific volume for the draft beers because bar staff called them "tall drafts" but did not say how much beer each glass held. Bar staff confirmed that the drinks Sandifur was served contained alcohol. Sandifur started drinking his first beer at 3:20 p.m. and finished his last beer at 7:02 p.m. He left the bar alone, got into his truck at 7:30 p.m., and drove away from the bar at 7:31 p.m.

{¶ 21} Based on his training and experience, Hakeos said that someone who consumed eight beers in less than five hours would exhibit "some impairment." He did not see anyone other than Sandifur driving Sandifur's truck, and the truck was in the Bunker Bar parking lot the entire time Sandifur was at the bar. Hakeos tried to obtain a police report filed because Sandifur's truck was stolen, but a report did not exist. As far as Hakeos knew, the crash happened approximately 20 minutes after Sandifur left the bar.

{¶ 22} On cross, Hakeos said that he knew that the incident he was investigating involved "a possibility of a stolen vehicle or a possibility of a drunk driver who left the scene of the accident . . .[,]" but did not involve a "serious injury" or fatality. Although Hakeos saw Sandifur drive his truck from the bar, he did not see the accident or see how Sandifur was driving at the time of the accident. He did not see Sandifur stumbling or

8.

swaying when he walked around in the bar, but said that the way a person walks is not necessarily indicative of how impaired they are. He did not know what Sandifur's blood alcohol level was when he left the bar. Hakeos thought it was important for an officer investigating a potential OVI to ask a suspect to perform field sobriety tests or take a breathalyzer test, but did not know the OSHP policies for these tests when a suspect is at their home. Ultimately, Hakeos could not say, as defense counsel put it, "beyond a shadow of a doubt that the accident was caused because someone was intoxicated[.]"

{¶ 23} After learning that Sandifur's truck was in the parking lot of Bunker Bar the whole afternoon on January 14 and that Sandifur left in the truck, Bergeron decided to charge Sandifur with OVI, leaving the scene of an accident, and failure to control. He based his charging decision on the surveillance footage from Bunker Bar, Sandifur's conflicting statements regarding when and where his truck was stolen, and Sandifur's inability to explain the injury he had shortly after the crash.

{¶ 24} In its October 26, 2022 verdict, the trial court found Sandifur guilty of OVI and failure to control and not guilty of failing to stop after an accident. Regarding the OVI charge, the court determined that Sandifur's "poor driving, the strong odor of alcohol on his breath, the condition of his eyes, his unsteadiness, his initial refusal to exit the home, and his consumption of eight beers during a five-hour period of time proved, beyond a reasonable doubt that [Sandifur] operated his truck while impaired." It found that the city proved that Sandifur was driving the truck at the time of the accident based on (1) Bergeron's testimony that Sandifur was the registered owner of the vehicle, lived near the scene, and appeared "disheveled, with bloody hands and a lacerated forehead,

9.

shortly after the crash[;]" (2) Hurley's testimony that she saw a man, who said that he lived in the subdivision across the street, wiping blood off of himself and walking from the direction of the crash approximately five minutes after hearing a loud screeching noise; and (3) Hakeos's testimony and the surveillance video from Bunker Bar showing that Sandifur drove his truck into the bar's parking lot around 2:30 p.m. and drove it out of the parking lot around 7:30 p.m., approximately 20 minutes before the crash was reported. It also found Sandifur's claim that his truck had been stolen that night "not . . . at all credible." It went on to find that the city proved that Sandifur was impaired at the time of the crash based on Bergeron testifying that Sandifur had "red, bloodshot, and glassy eyes, a 'strong odor' of alcohol emanating from his breath, and [] slurred speech[,]" and that he "had been staggering a bit and swaying and had appeared to be 'highly intoxicated.'" The court discounted Hurley's testimony that she did not see signs of impairment because "she was not trained in recognizing such symptoms," was ten to 12 feet from the people on the other side of her lattice fence, and "had been focused on [Sandifur's] injuries."

{¶ 25} Regarding the failure-to-control charge, the trial court found that Sandifur's "attempt to blame the collision on an unknown thief" was "unbelievable." It determined that Bergeron's testimony that the roads were clear, which was corroborated by Bunker Bar's clear parking lot, combined with the "heavy damage" to Sandifur's truck established that he had failed to operate his vehicle with reasonable control.

10.

{¶ 26} Finally, the trial court determined that the crash did not happen on a public roadway, as required to support a charge under R.C. 4549.02(A)(1), so it found him not guilty of the failure-to-stop charge.

{¶ 27} At the sentencing hearing, the trial court sentenced Sandifur to 180 days in jail, with 174 days suspended, one year of probation, a 12-month license suspension, and fines and costs.

{¶ 28} Sandifur now appeals, raising four assignments of error:

1. The Appellant Received Ineffective Assistance Of Counsel at the Trial Level by Trial Counsel Failing to File a Motion to Suppress his Statements to the State Trooper[.]

2. The Appellant Received Ineffective Assistance Of Counsel at the Trial Level by Trial Counsel Failing to question the State Trooper on any Training or Experience that the Trooper had with Head Injuries.

3. The Appellant Received Ineffective Assistance Of Counsel at the Trial Level by Trial Counsel Failing to File a Rule 29 Motion for Acquittal at any point during the Trial.

4. The Trial Court's Decision was Against the Manifest Weight of Evidence.

## II. Law and Analysis

### A. Trial counsel was not ineffective.

{¶ 29} In his first three assignments of error, Sandifur argues that his trial counsel provided ineffective assistance by failing to (1) file a motion to suppress, (2) question

11.

Bergeron about his training regarding head injuries, and (3) move for acquittal under Crim.R. 29 at the close of the city's case.

{¶ 30} The city responds that Sandifur has not shown that a motion to suppress would have been successful, trial counsel questioned Bergeron "extensively" about his knowledge and training regarding head injuries, and there is no evidence that a Crim.R. 29 motion would have been successful.

### 1. Standard of review

{¶ 31} To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984); and *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. A reasonable probability is one sufficient to undermine confidence in the outcome. *State v. Sanders*, 94 Ohio St.3d 150, 151 (2002). Failure to present sufficient evidence on either prong is fatal to an ineffective-assistance claim. *State v. Leasure*, 2023-Ohio-2710, ¶ 40 (6th Dist.), citing *Strickland* at 697.

{¶ 32} To prevail on an ineffective-assistance claim, the defendant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *Strickland* at 686. Properly licensed Ohio lawyers are presumed to be competent, and there are "countless" ways for an attorney to provide effective assistance in a case. *State v. Gondor*, 2006-

Ohio-6679, ¶ 62; *Bradley* at 142. Thus, "'[j]udicial scrutiny of counsel's performance must be highly deferential.'" *Bradley* at 142, quoting *Strickland* at 689. "[E]ffective assistance of counsel does not equate with a winning defense strategy . . . ." *State v. Strickland*, 2003-Ohio-491, ¶ 16 (6th Dist.).

{¶ 33} Counsel is "strongly presumed" to have rendered adequate assistance and "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *State v. Smith*, 17 Ohio St.3d 98, 100 (1985), quoting *Strickland* at 694-695. Generally, trial strategy and tactical decisions—even debatable ones—cannot form the basis of a claim of ineffective assistance of counsel. *State v. Grissom*, 2009-Ohio-2603, ¶ 22 (6th Dist.).

**2. There was no basis for suppressing Sandifur's statements to Bergeron.**

{¶ 34} In his first assignment of error, Sandifur argues that trial counsel should have moved to suppress his statement to Bergeron that he was at Bunker Bar earlier on the day of the crash because his statement led to the city finding video evidence of Sandifur drinking alcoholic beverages and driving his truck, and it is likely that he would not have been convicted if that video evidence had been excluded.

{¶ 35} Failure to file a motion to suppress is not per se ineffective assistance of counsel. *State v. Reynolds*, 2017-Ohio-1478, ¶ 61 (6th Dist.), citing *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000); and *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). Counsel's decision to forgo a suppression motion can be a matter of trial strategy. *Id.* Thus, failure to file a motion to suppress constitutes ineffective assistance of counsel only if the defendant proves, based on the record, that there was a basis to suppress the

13.

evidence and a reasonable probability that the motion would have been granted. *Id.*; *State v. Suarez*, 2023-Ohio-2715, ¶ 23 (9th Dist.), citing *State v. Brown*, 2007-Ohio-4837, ¶ 65; and *State v. Kendall*, 2012-Ohio-1172, ¶ 7 (9th Dist.).

{¶ 36} Sandifur characterizes his statements to Bergeron as a "confession" and contends that he could not consent to answering Bergeron's questions because of his "significant head injury[.]"  However, the cases he cites to support this argument involve a defendant's confession that was obtained during a custodial interrogation.  *See, e.g., State v. Banks-Harvey*, 2016-Ohio-4715 (2d Dist.).  To be classified as a "custodial interrogation," an officer's questioning must occur after a person has been taken into custody or deprived of his freedom in a significant way.  *State v. Escobedo*, 2023-Ohio-3410, ¶ 38 (6th Dist.), citing *State v. Wilson,* 76 Ohio App.3d 519, 522 (6th Dist. 1991); and *Miranda v. Arizona,* 384 U.S. 436, 444 (1966).  There is no evidence in the record that Sandifur was under arrest when Bergeron talked to him, or that Bergeron restrained his freedom.  Thus, Bergeron's questioning was not part of a custodial interrogation and the issue of whether his "confession" was coerced is not applicable here.

{¶ 37} The interaction between Sandifur and Bergeron is more appropriately categorized as a "consensual encounter."  In the context of constitutional protections, a police officer's interaction with a citizen can fall into one of three categories:  (1) consensual encounter, (2) investigative stop, or (3) arrest.  *State v. Watkins*, 2021-Ohio-1443, ¶ 19 (6th Dist.).  A consensual encounter does not require that an officer have the probable cause necessary for an arrest or the reasonable, articulable suspicion of criminal activity necessary for an investigatory stop, and does not implicate the protection from

14.

unreasonable searches and seizures in the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution. *Id.* at ¶ 22.

{¶ 38} An interaction is considered a consensual encounter if an officer approaches someone in public to engage them in conversation or request information, as long as the person is free to decline the officer's request and walk away. *Id.* A consensual encounter turns into an investigative stop when a reasonable person would no longer feel free to leave based on the officer's use of force or show of authority. *Escobedo* at ¶ 40.

{¶ 39} "[C]onsensual encounters do not lose their propriety simply because they take place at the entrance of [a] citizen's home." *State v. Woolley*, 2017-Ohio-576, ¶ 35 (5th Dist.). Officers are permitted to engage in a "knock-and-talk"—i.e., knocking on a person's front door for the purpose of talking to an occupant—without running afoul of the Fourth Amendment. *State v. Ash*, 2015-Ohio-4974, ¶ 12 (4th Dist.). Any statements that a person makes during a consensual encounter with an officer can later be used against them, as long as the person knows they can walk away and "police have not conveyed a message that compliance with their requests is required." *State v. Wertz*, 2017-Ohio-8766, ¶ 14 (2d Dist.).

{¶ 40} Here, it is clear that Sandifur told Bergeron that he had been at Bunker Bar earlier that day during a consensual encounter. Although Bergeron was at Sandifur's house to investigate a car crash, there is no evidence that he went there with the intent to arrest Sandifur or conduct a custodial interrogation, nor was there evidence that Bergeron displayed any show of force or authority that would cause a reasonable person to think

15.

that Sandifur could not end the interaction by stopping the conversation and closing his door. And there was no evidence that Sandifur could not end their conversation by closing the door and going back in the house. In fact, Sandifur went into the house and closed the door twice—once to get his license and insurance information and once to fill out a written statement about his stolen truck—and there is nothing apparent in the record that would have prevented him from staying in the house, rather than going back to talk to Bergeron two separate times. He also refused to step out of the house when Bergeron asked to speak to him outside—and Bergeron did not demand that he come out or forcibly remove him—which is additional evidence that the interaction had not escalated from a consensual encounter.

{¶ 41} Because Sandifur and Bergeron were engaged in a consensual encounter, Sandifur's comments about being at Bunker Bar that day were not obtained in a way that violated his constitutional rights, so they could be used against him at trial. Without pointing to an apparent constitutional violation, Sandifur has failed to show a basis for trial counsel filing a motion to suppress or a reasonable probability that the trial court would have granted a motion to suppress. Therefore, Sandifur has failed to show that trial counsel was ineffective by failing to file a motion to suppress, and his first assignment of error is not well-taken.

### 3. Trial counsel's questioning of Bergeron was trial strategy.

{¶ 42} In his second assignment of error, Sandifur argues that trial counsel was ineffective because counsel did not question Bergeron about his training and experience with head injuries, which prevented counsel from being able to draw the inference that

16.

the behavior Bergeron classified as intoxication was actually due to a head injury. The city counters that trial counsel *did* question Bergeron about his knowledge of head injuries and whether he knew if a concussion could explain Sandifur's behavior that night, so Sandifur's ineffective assistance argument is meritless.

{¶ 43} Generally speaking, whether and how to question a witness is a matter of trial strategy, and counsel has wide latitude in conducting cross-examination. *State v. Baumgartner*, 2004-Ohio-3908, ¶ 52 (6th Dist.); *In re P.T.*, 2007-Ohio-6293, ¶ 21 (9th Dist.) ("[A]n attorney's selection of questions for a witness is within the realm of trial tactics . . . ."). Reasonable trial strategy cannot form the basis of a claim of ineffective assistance of counsel, and it is important to remember that "effective assistance of counsel does not equate with a winning defense strategy . . . ." *Strickland*, 2003-Ohio-491, at ¶ 16 (6th Dist.); *Grissom*, 2009-Ohio-2603, at ¶ 22 (6th Dist.).

{¶ 44} Here, when trial counsel cross-examined Bergeron, he specifically asked whether the signs that Bergeron considered indicative of intoxication (e.g., swaying and slurred speech) might have been caused by a head injury that Sandifur sustained in the crash. Bergeron conceded several times that it was "possible" that Sandifur's actions were the result of a head injury, but ultimately concluded based on his training and experience as a police officer that Sandifur was intoxicated. Counsel chose not to further delve into Bergeron's experience and training with head injuries. This was a sound cross-examination tactic that counsel could have chosen for any number of reasons, considering that Bergeron had already admitted—multiple times—that a head injury might have accounted for the behavior he observed. We will not second-guess trial

17.

counsel's strategic decisions, and counsel's choice of tactics was not so far outside of the range of reasonable representation that it rises to the level of ineffective assistance. Therefore, Sandifur's second assignment of error is not well-taken.

### 4. A Crim.R. 29 motion would have been futile.

{¶ 45} In his third assignment of error, Sandifur argues that trial counsel's failure to make a Crim.R. 29 motion at the close of the city's case constitutes ineffective assistance because counsel's decision forfeited Sandifur's ability to argue the sufficiency of the evidence on appeal, which prejudiced him because it "prevented [him] from possibly being found not guilty at the trial level."

{¶ 46} The city responds that the trial court "could have acquitted [Sandifur] . . . but did not" after the city presented its case, despite Sandifur not moving for acquittal. It also points out that courts generally do not find that trial counsel was ineffective when "there is simply no evidence that a Rule 29 motion for acquittal would have resulted in an acquittal . . . ."

{¶ 47} A trial court can only grant a Crim.R. 29 motion for acquittal when, construing the evidence most strongly in favor of the prosecution, the evidence is insufficient to sustain a conviction. *State v. Grate*, 2020-Ohio-5584, ¶ 146, citing *State v. Scott*, 2003-Ohio-2797, ¶ 20 (6th Dist.). "Counsel's failure to make a Crim.R. 29 motion for acquittal is not ineffective assistance when such a motion would have been futile." *Id.*, citing *Scott* at ¶ 20; and *Thomas v. United States*, 951 F.2d 902, 905 (8th Cir. 1991).

{¶ 48} Sandifur does not in any way argue that the city's evidence was insufficient to convict him of OVI or failure to control. Indeed, the evidence shows (1) Sandifur

18.

owned the crashed truck; (2) Sandifur's truck was found wrecked and abandoned across from Sandifur's subdivision; (3) very shortly after hearing a "loud screeching," Hurley saw a bleeding man walking from the direction of the crashed truck; (4) Hurley, who was eight to ten feet away from the bleeding man, did not smell alcohol on him, hear him slur, or see him stumble, but qualified her testimony by saying that she was too far away to smell him, mostly spoke to the woman with him, and could not see well through her fence; (5) when Bergeron went to Sandifur's home, he noticed that Sandifur looked disheveled, had blood on his hands, a bleeding cut on his forehead, "red, bloodshot, glassy eyes," slurred speech, and a "strong odor of alcoholic beverage coming off him, his breath," and was staggering and swaying "a little bit" as he spoke to Bergeron; (6) Bergeron did not administer field sobriety tests or a breathalyzer test; (7) Sandifur refused offers of medical assistance from both Hurley and Bergeron; (8) Sandifur told Bergeron that he could not remember being in an accident or "remember anything;" (9) Sandifur gave conflicting stories about when and where his truck was allegedly stolen; (10) Sandifur was at Bunker Bar for approximately five hours and consumed eight beers (five that were 16 to 24 ounces each and three that were 12 ounces each) in less than four hours; (11) Hakeos did not see Sandifur stumbling or swaying as he walked around the bar; and (12) Sandifur drove his truck to Bunker Bar, the truck was in the bar's parking lot the entire time Sandifur was at the bar, and Sandifur drove the truck out of the bar's parking lot approximately 20 minutes before the crash was reported.

{¶ 49} Taken together, and construing the evidence in the city's favor, this is sufficient to show that Sandifur "operate[d] any vehicle . . . within this state . . ." while he

was "under the influence of alcohol, . . ." as required to prove OVI in violation of R.C. 4511.19(A)(1)(a), and "operate[d] a motor vehicle . . . on any street [or] highway . . . without being in reasonable control of the vehicle, . . ." as required to prove failure to control in violation of R.C. 4511.202(A).

{¶ 50} Because the evidence presented at trial was sufficient to support the convictions, trial counsel's failure to make a futile Crim.R. 29 motion does not rise to the level of ineffective assistance. Accordingly, Sandifur's third assignment of error is not well-taken.

### B. Sandifur's convictions are not against the weight of the evidence.

{¶ 51} In his final assignment of error, Sandifur argues that his convictions are against the manifest weight of the evidence because (1) there were no field sobriety tests or chemical tests done to assess his level of impairment; (2) Hurley could not identify Sandifur as the man she talked to and said that the man did not appear intoxicated; (3) Bergeron said that Sandifur had a "significant head injury," but "did not infer that any of the swaying or staggering of [Sandifur] was due to [Sandifur's] head injury he only inferred that it was from his alleged intoxication[;]" (4) Hakeos could not testify to the strength of the beers he saw Sandifur drink at Bunker Bar; and (5) Hakeos did not see any signs of impairment when Sandifur drove away from the bar. The city responds that "[t]here is substantial evidence upon which a trier of fact could reasonably conclude all the elements have been proved beyond a reasonable doubt."

{¶ 52} When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of

the witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997). We do not view the evidence in a light most favorable to the prosecution. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 2012-Ohio-6068, ¶ 15 (6th Dist.), quoting *id.* Reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172*,* 175 (1st Dist. 1983).

{¶ 53} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the trial court's credibility determinations, given that the court had the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). The trial court, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness's testimony. *State v. Caudill*, 2008-Ohio-1557, ¶ 62 (6th Dist.), citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 54} After carefully reviewing the evidence and the credibility of the witnesses and weighing the testimony, we are not convinced that this is an exceptional case in which the evidence weighs heavily against a conviction.

21.

**{¶ 55}** First, we note that Sandifur misrepresents the evidence against him. For example, although he claims that Hurley said that he was not intoxicated, she explained that she did not notice the signs of impairment that the attorneys asked her about, and specifically said that she did not know if the man appeared intoxicated. Similarly, Bergeron did not testify that Sandifur had *any* head injury beyond a cut on his forehead— let alone a "significant" head injury. He also admitted that it was "possible" that some of Sandifur's behavior was caused by a head injury, but ultimately determined that Sandifur was intoxicated.

**{¶ 56}** The evidence *actually* shows that Sandifur drank eight beers in a little less than four hours; drove his truck out of Bunker Bar's parking lot 20 minutes before the crash involving his truck was reported; had a bloody cut on his head and looked disheveled when Bergeron came to his house soon after the crash; had red, bloodshot, glassy eyes, smelled strongly of alcohol, and was staggering and swaying when he talked to Bergeron; and initially claimed that he did not remember "anything," but later claimed that his truck had been stolen, either from Bunker Bar around 5:30 p.m. or from his driveway around 8:30 p.m. Although there is a possibility that Sandifur's behavior could have been due to a head injury, nothing in the record rebuts the definitive testimony of Bergeron—the only witness who interacted with Sandifur for an extended period of time and at close range—that Sandifur was acting highly intoxicated.

**{¶ 57}** Taken together, this is circumstantial evidence that Sandifur drove his truck while under the influence and failed to maintain reasonable control of his truck. *See State v. Cunningham*, 2017-Ohio-377, ¶ 16 (7th Dist.), quoting *State v. Heiney*, 2007-Ohio-22.

1199, ¶ 23 (11th Dist.) ("'Erratic driving is indicative of the driver being under the influence of alcohol . . . Being involved in a single-vehicle accident with no significant outside factors is circumstantial evidence of erratic driving.'" (Ellipsis sic.)). On balance, we cannot say that the trial court lost its way or created a manifest miscarriage of justice by relying on the circumstantial evidence. We find, therefore, that Sandifur's convictions are not against the manifest weight of the evidence. Sandifur's fourth assignment of error is not well-taken.

### III. Conclusion

{¶ 58} Based on the foregoing, the January 13, 2023 judgment of the Sylvania Municipal Court is affirmed. Sandifur is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Christine E. Mayle, J.                 _____
                                                JUDGE

Myron C. Duhart, J.            

Charles E. Sulek, P.J.         _____
CONCUR.                                        JUDGE


                                         _____
                                                JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.