[Cite as *State v. Smith*, 2025-Ohio-1807.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WILLIAMS COUNTY

State of Ohio

    Appellee

v.

Samantha R. Smith

    Appellant

Court of Appeals No. WM-24-018

Trial Court No. 23CR00099

**<u>DECISION AND JUDGMENT</u>**

Decided:

* * * * *

Katherine J. Zartman, Prosecuting Attorney, and
Emil G. Gravelle Assistant Prosecuting Attorney for appellee.

Karin L. Coble, for appellant.

* * * * *

**ZMUDA, J.,**

## I. Introduction

{¶ 1} This matter is before the court on appeal of the judgment entered by the Williams County Court of Common Pleas on August 12, 2023, sentencing appellant, Samantha Smith, to a five-year term of community control and ordering forfeiture of the vehicle used in commission of the offense. Finding no error, we affirm.

## II. Background

{¶ 2} On May 17, 2023, appellant Samantha Smith attempted to hit her former boyfriend, M.S., with her vehicle, while in the driveway of M.S.'s residence. The incident occurred during appellant's retrieval of personal belongings from the residence, after the couple's recent break-up. Both M.S. and appellant recorded video of the incident and events leading up to the incident.

{¶ 3} As a result of the trouble between appellant and M.S., the sheriff's department responded to reports of potential domestic violence at the residence. After taking statements, deputies took appellant into custody. Appellant's statements to the arresting deputy were recorded, with appellant claiming she did not try to hit M.S. with her car but was only trying to escape him. Appellant also claimed that M.S.'s friend, H.B., struck her with a bat or baton as appellant and H.B. fought over appellant's belongings in H.B.'s car. She also stated that M.S. had a history of damaging appellant's property and car, and M.S. had placed screws and nails in his driveway to damage appellant's tires.

{¶ 4} A day later, while appellant was in custody at CCNO pending arraignment, she recounted the events to a friend in a video call. Appellant described her encounter with H.B. as a confrontation in which appellant let H.B. hit her, taunting H.B. to hit her again and "give me a fuckin' reason." H.B. fled, and appellant stated she was so full of adrenaline over the encounter with H.B. that she could have "beat up a grown man, easy."

{¶ 5} As to the incident with M.S., appellant told her friend that M.S. opened the passenger door of her car to take her dog, and appellant threatened M.S.

2.

I said touch my fuckin' dog, I said I'll knock your fuckin' head off, [M.S.], I said I'll fuckin' shoot you right in the fuckin' face. And then he took, the reason I tried to run him o---. The reason I tried to run into the fence… [smile] was because, uh, um, he fuckin' threw a rock at my car and he kicked it real hard and he fuckin' was acting crazy…

{¶ 6} On June 12, 2023, appellant was indicted on one count of felonious assault in violation of R.C. 2903.11(A)(2) and (D)(4). Appellee, the State of Ohio alleged that appellant attempted to cause physical harm to M.S. with a deadly weapon, her Volkswagen Fahrenheit GTI. The indictment included a forfeiture specification alleging the Volkswagen was an instrumentality used in commission of the offense.[1] On June 29, 2023, appellant was arraigned and entered a not guilty plea to the indictment.

{¶ 7} On January 22, 2024, appellant filed a notice of self-defense and notice of intent to use evidence of prior acts of M.S. to demonstrate that M.S. was the aggressor for the purpose of demonstrating self-defense. The state opposed the use of prior acts as evidence and sought a ruling, in limine, to preclude evidence of M.S.'s character. After hearing on the motion, the trial court excluded evidence of conduct after the incident of May 17, 2023, but denied the motion in limine as to evidence of conduct preceding the incident, reserving ruling on admissibility until trial.

{¶ 8} The matter was tried to a jury on April 17 and 18, 2024. At trial, appellant maintained she acted in self-defense, arguing M.S. had made it dangerous for her to remain on the property and she was forced to drive forward in the driveway to exit

---

[1] The state also charged appellant in a second case with retaliation and intimidation, both felonies of the third degree. The jury acquitted appellant of these charges in a joint trial of the two cases. Based on the acquittals, we limit our discussion to the testimony and evidence relevant to the felonious assault conviction.

3.

through the yard. Despite her self-defense claim, however, appellant argued that she did not intentionally drive in the direction of M.S.

{¶ 9} The state presented testimony of the responding deputies, as well as the testimony of M.S. and his female friend, H.B. This testimony portrayed appellant as the aggressor immediately before and during the incident. The state also presented video of the incident and appellant's recorded statements, after the incident.

{¶ 10} The responding deputy, Kyle Potts, testified regarding his observations at the scene. As he arrived, he witnessed appellant yelling profanities from her car, accusing M.S. of lying. Potts separated appellant and M.S. and spoke to M.S. first. M.S. informed Potts he had moved out after the couple ended their relationship, and M.S. was at the home to remove some of his belongings, stating his property had been "coming up missing." M.S. told Potts about appellant's altercation with H.B., and about appellant's attempts to hit him with her car, first by backing towards him, and then by accelerating in his direction once he was in front of her car. M.S. told Potts that appellant got close enough to hitting him "that he had to jump out of the way into an opening in the fence." M.S. produced a video recording of the incident, and the video showed the wheels of appellant's car turning in the direction of M.S. as the car accelerated and M.S. ran away.

{¶ 11} Once backup arrived, Potts interviewed appellant. Potts indicated that appellant "was very hysterical. Hard to console." Appellant told Potts that she arrived to see M.S. putting her property into H.B.'s vehicle, and H.B. hit appellant's car and appellant with a baseball bat, indicating she was hit on her chest. Potts found no marks or other indication of trauma to appellant's body or to her vehicle. Potts also testified that he

4.

had been to the residence on prior occasions, in response to other incidents involving appellant and M.S., but those incidents concerned a civil dispute over property. Potts recalled an earlier incident that resulted in disorderly charges against both M.S. and appellant. Based on the video of the present incident, Potts took appellant into custody. Potts then followed up with M.S. and H.B., asking them for written statements of the incident.

{¶ 12} Deputy Tyler Maynard testified that he reported to the scene after Potts, and helped photograph the scene and collect the video from M.S. Maynard also transported appellant to CCNO, after her arrest. After being advised of her *Miranda* rights, appellant spoke to Maynard during transport and at CCNO, in an interview room. The interview at CCNO was recorded. Maynard testified that appellant told him her version of events, including H.B. hitting appellant with her car and a police-type baton. Appellant pointed out places she claimed to be injured, but Maynard noted no redness, swelling, or bruising as would be expected, based on appellant's claims. Appellant also described the incident, maintaining she was trying to run into the fence and get away from M.S. Maynard testified that he "could not make sense" of appellant's story, considering appellant had a clear path to back out of the driveway even if there were nails in the driveway, and Maynard could not reconcile claims of escaping M.S. with appellant's actions, turning the wheel toward M.S. and accelerating in the direction of the fence as a means to "get away" from M.S.

{¶ 13} M.S. gave his own version of the incident. He testified that after he and appellant ended their relationship, he left the home he owned to give appellant space to

5.

move out. After appellant failed to move out, M.S. had to evict her to force appellant to eventually leave. On the date of the incident, M.S. was at home to retrieve some of his belongings when he noticed appellant in front of the home, in her car. M.S. asked appellant to leave. Appellant remained in her car and called 911, but eventually left. M.S. remained at the property, unaware of the 911 call.

{¶ 14} Appellant returned later that day as M.S. was loading items into H.B.'s car. Appellant saw this, and believing the items were her property, drove up, exited her vehicle, and confronted H.B. Appellant reached into H.B.'s car and grabbed things, and according to M.S., appellant started "throwing stuff all over the road and screaming, yelling." M.S. told appellant to leave and H.B. backed away and drove off as appellant returned to her car.

{¶ 15} Once appellant was back behind the wheel, she drove into the yard as M.S. picked up items from the road. While M.S. worked to clear the roadway of property, appellant left the yard and drove onto the driveway. When M.S. stepped onto the driveway, appellant started backing up towards him. M.S. walked around appellant's car and up the driveway, and as M.S. crossed toward the house in front of appellant's car, appellant revved the engine and accelerated toward appellant. M.S. ran to get behind the fence, testifying that he "had to put my hand on the car and it, I was pushing off the car kinda like jumping to the side to get around in on the front." M.S. testified that he considered jumping on the hood of the car to avoid getting pinned between the house and appellant's car.

6.

{¶ 16} M.S. testified that the couple had a contentious relationship that included instances when he had "gotten in [appellant's] face." M.S. maintained that he was never physically violent with appellant or threatened injury to her. On the date of the incident, appellant was still living in the home and M.S. was at the property to work in the shop, a building not accessible to appellant. M.S. had video of appellant's attempt to run him over, demonstrating a rapid acceleration from a standstill in the direction of M.S., and he provided the video to the deputies.

{¶ 17} Appellant testified on her own behalf. She described a contentious relationship with M.S., beginning in 2020. The two lived together off and on, with appellant most recently returning to the home in January 2023. Appellant testified that M.S. was physically violent and she placed security cameras in the home "cause the police kept telling me, get it on video[.]" On the date of the incident, appellant testified that she and her dog took refuge in her car after M.S. kicked in the door of the home, and she called the police and drove away "to get far away." Appellant testified she only returned that day because M.S. called and told her, "I'm destroying all your things and I'm going to burn 'em all. You better come back here." Appellant also testified regarding a text she received from M.S. telling her to remove all her belongings from the house that day. [2]

{¶ 18} When appellant arrived at the home, she saw H.B. sitting in her car in front of the property. Appellant exited her vehicle and approached H.B.'s car, noting

_____

[2] The text exchange was admitted as a defense exhibit at trial, over the prosecutor's objection.

7.

appellant's property in the car, including her crockpot, her son's blanket, her clothes, and her dishes and silverware. After confronting H.B. through the driver's window, appellant testified that H.B. struck her with a "black style police baton." Appellant then opened the back door of H.B.'s car and started removing her property and throwing it in the road. Appellant testified that she fled to her car when she heard M.S. approaching so he would not "get his hands on me."

{¶ 19} Before she could engage the locks, M.S. had her passenger door open and tried to grab appellant's dog. Appellant "just wrapped my arms around [the dog] and I said you're not taking my dog." M.S. withdrew and appellant pulled the car door shut. Then, appellant drove into the front yard and "did some donuts." She testified that M.S. followed her and used a rock or "boulder" to strike at the car windows. Appellant testified that M.S. had broken her car window in the past, so she knew that "even with my windows up, he could get me." Appellant indicated all of this occurred prior to the video recorded by M.S.

{¶ 20} As to the events portrayed on video, appellant acknowledged she backed toward M.S. in the driveway and then accelerated in his direction, but claimed she did not notice him behind her car and was not trying to hit M.S. when he was in front of her car. She testified that she "just wanted to get away" and that she knew "he was going to kill me." On cross-examination, appellant admitted she was angry and admitted she had damaged some of her own property in her rage, when she pulled it from H.B.'s car and angrily threw it on the road. Appellant also admitted she revved her engine as she drove toward M.S. and that her vehicle weighed thousands of pounds, but maintained she was

8.

aiming for the fence and it was a coincidence that M.S. was walking around her car at the same time she tried to go through the fence. Appellant claimed she hit the brakes to avoid hitting M.S.

{¶ 21} After the prosecutor played the segment of appellant's video call from CCNO, in which she caught herself before fully admitting she tried to run M.S. over, appellant acknowledged she "almost said it." Appellant claimed that everyone told her that she "tried to run him over, so I almost said it myself." Appellant also claimed her smile immediately after catching herself was due to frustration, insisting that at the time of the incident she was fearful of M.S. Appellant admitted, however, that at no point in the video is M.S. holding a big rock or "boulder" and threatening her. Finally, appellant admitted that she stayed on scene until deputies arrived, despite her claim that she drove into the fence because she wanted to get away from M.S.

{¶ 22} At the close of testimony, the trial court addressed proposed jury instructions, including the self-defense instruction proffered by appellant. The state objected to an instruction on self-defense, arguing the defense failed to meet the initial burden of demonstrating a self-defense claim. Specifically, the state noted that appellant asserted the use of force in self-defense while also claiming she never tried to use force against M.S.

{¶ 23} In response, appellant argued that she had met the burden of showing she was not at fault in creating the situation, she had a reasonable belief of imminent bodily harm, and that she did not use disproportionate force in defending against imminent bodily harm. Based on appellant's testimony, there was evidence of her history with M.S.

9.

and her fear of what M.S. could do to her, as well as evidence that appellant only came to the home because M.S. told her to come and get her property. Appellant argued that her conduct, driving her car, demonstrated she was trying to escape M.S.

{¶ 24} The trial court overruled the state's objection and gave an instruction on self-defense to the jury. Appellant did not object to any of the proposed jury instructions, including the following instruction as to a vehicle as a deadly weapon:

> Deadly weapon means any instrument, device or thing capable of inflicting death, or specially adopted for use as a weapon or used as a weapon.

{¶ 25} After deliberations, the jury returned a guilty verdict as to felonious assault and additionally found that the state proved by clear and convincing evidence that the white Volkswagen Fahrenheit GTI was subject to forfeiture. The trial court continued the matter for sentencing.

{¶ 26} On July 22, 2024, the trial court held a sentencing hearing and found a community control sanction was consistent with the purposes of R.C. 2929.11. The trial court sentenced appellant to a five-year period of community control and ordered forfeiture of the vehicle. The trial court journalized its sentencing entry on August 12, 2024.

{¶ 27} This appeal followed.

### III. Assignments of Error

{¶ 28} In challenging the conviction, appellant asserts the following as error:

> Assignment of Error One: The conviction was unsupported by sufficient evidence and was therefore a violation of Due Process as

guaranteed by the 5th and 14th Amendments to the U.S. Constitution and Article I, Section 16 of the Ohio Constitution and was against the manifest weight of the evidence because the vehicle was not a "deadly weapon."

Assignment of Error Two: The conviction was unsupported by sufficient evidence and was therefore a violation of Due Process as guaranteed by the 5th and 14th Amendments to the U.S. Constitution and Article I, Section 16 of the Ohio Constitution and was against the manifest weight of the evidence because Ms. Smith lacked the required mens rea for the offense.

Assignment of Error Three: The jury instructions regarding "deadly weapon" were flawed and prejudiced appellant.

Assignment of Error Four: Appellant was denied effective assistance of counsel in violation of the Sixth Amendment to the U.S. Constitution and Article I, Section 10 of the Ohio Constitution due to the failure of defense counsel to move for acquittal pursuant to Crim.R. 29.

## IV. Analysis

{¶ 29} In her first and third assignments of error, appellant challenges the sufficiency and weight of the evidence as to the jury's finding that a vehicle is a deadly weapon and challenges the trial court's definition of "deadly weapon" in the jury instructions. In her second assignment of error, appellant challenges the sufficiency and weight of the evidence of appellant's intent to commit the offense. In her fourth assignment of error, appellant challenges the sufficiency of the evidence, generally, by arguing her trial counsel was constitutionally ineffective in failing to move for acquittal under Crim.R. 29. For ease of discussion, we address some assignments of error together.

### A. Vehicle as Deadly Weapon

{¶ 30} Appellant argues, in her first and third assignments of error, that a vehicle is not a "deadly weapon" based on the facts in her case, sufficient to sustain a conviction

11.

for felonious assault. Appellant challenges both her conviction based on the sufficiency and weight of the evidence in the first assignment of error, as well as the trial court's definition of "deadly weapon" in the jury instructions, in the third assignment of error. We begin by addressing appellant's argument regarding the trial court's definition of "deadly weapon."

**{¶ 31}** "Generally, a trial court has broad discretion in deciding how to fashion jury instructions." *State v. White,* 2013-Ohio-51, ¶ 97 (6th Dist.). However, the trial court must give "complete and accurate jury instructions on all the issues raised by the evidence." *White* at ¶ 97, quoting *State v. Sneed,* 63 Ohio St.3d 3, 9 (1992). In this case, the trial court defined "deadly weapon" for the jury, and appellant acknowledges that she did not object to the jury instruction in the trial court, waiving all but plain error as to her third assignment of error. *See State v. Nastal,* 2022-Ohio-970, ¶ 17 (6th Dist.), citing *State v. Long,* 53 Ohio St.2d 91, 94-95 (1978), citing Crim.R. 30 and Crim.R. 52(B).

**{¶ 32}** "An erroneous jury instruction does not amount to plain error unless, but for the error, the result of the trial clearly would have been different." *State v. Anaya,* 2010-Ohio-6045, ¶ 43 (6th Dist.), citing *State v. Long,* 53 Ohio St.2d 91 (1978), paragraph two of the syllabus. We are cautious in considering plain error, which is appropriately found "under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Long* at paragraph three of the syllabus. Furthermore, we consider the challenged jury instruction, not in isolation, but in the context of the trial court's overall charge. *Anaya* at ¶ 43, citing *State v. Diar,* 2008-Ohio-6266, ¶ 126.

12.

{¶ 33} In challenging the "deadly weapon" element, appellant argues her vehicle did not constitute a "deadly weapon" and therefore the trial court committed plain error regarding the jury instruction, because it "did not conform to applicable law" and rested on an assumption that appellant's vehicle "met the definition of 'deadly weapon.'" Essentially, appellant argues that the facts did not demonstrate use as a "deadly weapon," and the jury instruction was defective because it omitted the language, "great bodily harm," as part of the definition of "deadly weapon." In contrast, the state argues that the definition provided was correct and complete, including within the definition anything "used as a weapon," with the elements of felonious assault defined by the trial court in its jury instruction including the element of physical harm.

{¶ 34} Here, the trial court provided the standard instruction which incorporates the statutory definition of "deadly weapon" as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A). Appellant argues that the omission of "great bodily harm" from the definition of "deadly weapon" requires reversal. This argument, however, conflates the elements of the offense charged with the specific definition of "deadly weapon."

{¶ 35} Appellant was charged with felonious assault in violation of R.C. 2903.11(A)(2) and (D)(4), which provides:

> (A) No person shall knowingly do either of the following:
> …
> (2) Cause or attempt to cause physical harm to another …by means of a deadly weapon ….

13.

(D) (4) In addition to any other sanctions imposed pursuant to division (D)(1) of this section for felonious assault committed in violation of division (A)(2) of this section, if the deadly weapon used in the commission of the violation is a motor vehicle, the court shall impose upon the offender a class two suspension of the offender's driver's license, commercial driver's license, temporary instruction permit, probationary license, or nonresident operating privilege as specified in division (A)(2) of section 4510.02 of the Revised Code.

{¶ 36} As an element of felonious assault, the state was required to prove that appellant caused or attempted to cause physical harm "by means of a deadly weapon." Ohio precedent "is replete with examples of vehicles being considered deadly weapons." *State v. Walker,* 2023-Ohio-4690, ¶ 21 (2d Dist.), citing *State v. Evans,* 2002-Ohio-3322, ¶ 22 (10th Dist.) ("An automobile may be classified as a deadly weapon because it is capable of inflicting death.") (additional citations omitted.). We have held that a vehicle could be a deadly weapon "when used in a manner likely to produce death or great bodily harm." *State v. Nastal,* 2022-Ohio-970, ¶ 20 (6th Dist.), quoting *State v. Belcher,* 2014-Ohio-5596, ¶ 29 (6th Dist.). There must be an intent to use the vehicle to inflict harm, moreover, as "careless or negligent use of a vehicle" is insufficient without "evidence that the driver actually used or possessed the vehicle as a weapon as opposed to a conveyance." (Citation omitted) *Nastal* at ¶ 20.

{¶ 37} While the determination of vehicle as a deadly weapon is based on intent and manner of use, a deadly weapon is defined based on capabilities, not use. "An instrument, no matter how innocuous when not in use, is a deadly weapon if it is of sufficient size and weight to inflict death upon a person, when the instrument is wielded against the body of the victim or threatened to be so wielded. The manner of use of the

14.

instrument, its threatened use, and its nature determine its capability to inflict death." *State v. Deboe,* 62 Ohio App.2d 192, 193 (6th Dist. 1977).

{¶ 38} The trial court defined "deadly weapon" for the jury based on the vehicle's capability of "inflicting death" when used "as a weapon."[3] We find no error with this definition, considering the trial court provided separate instruction on the elements necessary to establish felonious assault. It was therefore a matter for the jury to determine, as a question of fact, whether appellant used her vehicle as a deadly weapon in committing felonious assault. *See Belcher* at ¶ 29, citing *State v. Hutchins*, 1991 WL 154064, *3 (6th Dist. Aug. 9, 1991). Accordingly, lacking any error by the trial court in defining "deadly weapon," there is no plain error in this regard, and appellant's third assignment of error is not well-taken.

{¶ 39} Appellant next argues a lack of sufficient, credible evidence to support her conviction based on a finding that her vehicle was used as a deadly weapon. "Sufficiency of evidence is a term of art for applying the legal standard to determine whether the evidence is legally sufficient to support the verdict as a matter of law." *Toledo v. Manning*, 2019-Ohio-3405, ¶ 13 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The test for sufficiency is one of adequacy, or "whether the evidence, if believed, can sustain the verdict as a matter of law." *Manning* at ¶ 12, citing *State v. Myers*, 2018-Ohio-1903, ¶ 132. In addressing the sufficiency of the evidence, we do not consider credibility of the evidence but instead must determine if the prosecution satisfied

_____

[3] While the trial court did not include the words, "great bodily harm," most would agree that "death" is consistent with "great bodily harm."

15.

its burden of production at trial as to each element of the charged offense. *State v. Dean,* 2018-Ohio-1740, ¶ 23-24.

{¶ **40**} Unlike sufficiency, a challenge based on the manifest weight of the evidence addresses the prosecution's burden of persuasion, or whether "the trial court could find a greater amount of credible evidence was admitted at trial to sustain [the verdict] than not." *Manning* at ¶ 41, citing *State v. Montgomery,* 2016-Ohio-5487, ¶ 75, citing *Thompkins* at 387. In reviewing a verdict against the manifest weight of the evidence, we defer to the trial court's credibility determinations, with the testimony of a single witness, deemed credible by the trial court, enough to support the conviction. *Manning* at ¶ 41-42.

{¶ **41**} The evidence at trial demonstrated appellant's vehicle had "sufficient size and weight to inflict death" and that appellant used the vehicle as a weapon against M.S. The testimony and evidence, including video of the incident, demonstrated appellant accelerated quickly toward M.S. as he crossed in front of her vehicle in the driveway, causing M.S. to take evasive action to avoid being struck by the vehicle. Considering the record evidence demonstrating both capability of the vehicle of inflicting death and its use as a weapon against M.S., we find both sufficient evidence and that appellant's conviction was supported by the weight of the credible evidence. Appellant's first assignment of error, therefore, is not well-taken.

16.

**B. Intent to Inflict Physical Harm**

{¶ 42} In her second assignment of error, appellant argues there was insufficient evidence of her intent to inflict physical harm, and the manifest weight of the evidence did not demonstrate such intent. In response, the state argues that there was sufficient, credible evidence of appellant's intent to cause physical harm to M.S., based on evidence adduced at trial. As previously stated, sufficiency of the evidence is a matter of production and weight of the evidence is a matter of persuasion. (Citations omitted) *Manning* at ¶ 12; ¶ 41. Considering the record of this case, the state met its burdens of both production and persuasion.

{¶ 43} Appellant was convicted of felonious assault in violation of R.C. 2903.11(A)(2), which prohibits knowingly causing or attempting to cause physical harm to another by means of a deadly weapon. A "deadly weapon" was defined for the jury as an instrument "capable of inflicting death." The requisite intent to commit this crime is "knowingly," which is defined at R.C. 2901.22(B) as follow:

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

{¶ 44} As previously addressed, the state adduced sufficient, credible evidence to support the finding that appellant's vehicle was used as a deadly weapon. To demonstrate appellant acted knowingly, the state "merely needed to demonstrate that serous physical

17.

harm was a reasonable and probable result of appellant's conduct." *State v. Stevens,* 2020-Ohio-6981, ¶ 27 (6th Dist.), citing *State v. Laney,* 2019-Ohio-2648, ¶ 19 (6th Dist.) (additional citation omitted.). In considering appellant's state of mind at the time of the offense, we may infer intent from the "totality of the circumstances surrounding the incident." *Stevens* at ¶ 27, quoting *State v. Rodriquez,* 2003-Ohio-3453, ¶ 36 (6th Dist.) (additional citation omitted.).

{¶ 45} Based on the evidence at trial, including the video of the incident, appellant revved her engine and accelerated in the direction of M.S. once he was in front of her car, turning the steering wheel in his direction. Appellant also acknowledged she tried to run him over in a video call from CCNO, admitting she caught herself before finishing her sentence when she said, "the reason I tried to run him o---.," acknowledging she "almost said it" but claimed she nearly admitted it only because everyone told her that she tried to run M.S. over. Finally, appellant maintained throughout the trial that she acted in self-defense in driving toward M.S.[4] "Self-defense is an affirmative defense whereby the defendant, in essence, admits to the facts of the state's case but offers additional facts that

---

[4] Appellant wholly ignores this fact on appeal, with no mention of her assertion of the defense or the trial court's instruction to the jury regarding self-defense, over the state's objection. As a result, the burden shifted to the state to demonstrate that appellant *did not* act in self-defense. *See State v. Messenger,* 2022-Ohio-4562, ¶ 27. By challenging the state's evidence regarding the elements of felonious assault, appellant does not address the effect of her assertion of self-defense. "[T]his defense admits the facts claimed by the prosecution and then relies on independent facts or circumstances which the defendant claims exempt him from liability." (Citation omitted) *State v. Martin,* 21 Ohio St.3d 91, 94 (1986), *superseded by statute on other grounds as noted in State v. Brooks,* 2022-Ohio-2478, ¶ 15 ("The only thing that the amendments to R.C. 2901.05 changes is which party has the burden of proving of disproving a self-defense claim at trial.").

18.

justify or excuse the defendant's use of force." *Maumee v. Yeager,* 2024-Ohio-858, ¶ 65 (6th Dist.), citing *State v. Poole,* 33 Ohio St.2d 18, 19-20 (1973). Self-defense "presumes intentional, willful use of force *to repel force or escape force.*" (Emphasis sic.) *State v. Wilson,* 2024-Ohio-776, ¶ 18, quoting *State v. Champion,* 109 Ohio St. 281, 286-287 (1924).

{¶ 46} Considering the record, which included the testimony and video evidence, appellant's admission, and appellant's assertion of self-defense, the totality of the circumstances demonstrate appellant's knowing conduct in trying to run M.S. over with her vehicle. The state, therefore, met its burdens of production and persuasion, and the finding that appellant acted knowingly was supported by sufficient, credible evidence. Appellant's second assignment of error, accordingly, is not well-taken.

## C. Ineffective Assistance

{¶ 47} In the fourth and final assignment of error, appellant argues her trial counsel was constitutionally ineffective in failing to move for acquittal at the close of the state's case. We address an ineffective assistance of counsel claim according to the test set forth in *Strickland v. Washington,* 466 U.S. 668, 687 (1984). *See State v. Bradley,* 42 Ohio St.3d 136 (1989), paragraph two of the syllabus.

{¶ 48} "To establish ineffective assistance of counsel, an appellant must show '(1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different.'" *State v. Sandifur,*

19.

2024-Ohio-2414, ¶ 31, quoting *State v. Hale,* 2008-Ohio-3426, ¶ 204, quoting *Strickland* at 687-688; *Bradley* at paragraph two of the syllabus.

{¶ 49} Appellant argues her trial counsel's failure to move for acquittal pursuant to Crim.R. 29 constituted ineffective assistance of counsel, meriting a new trial. For the trial court to grant a Crim.R. 29 motion, however, the court must find that the evidence adduced by the state was insufficient to sustain a conviction, construing the evidence most favorably for the prosecution. *Sandifur* at ¶ 47, citing *State v. Grate,* 2020-Ohio-5584, ¶ 146 (additional citation omitted.).

{¶ 50} We previously addressed the sufficiency of the evidence as to the requisite mental state, or intent, and the requirement of a "deadly weapon" as elements of the offense. In reviewing the record and construing the evidence most favorably for the prosecution, we determined the state produced sufficient evidence as to these elements at trial. Thus, appellant fails to demonstrate ineffective assistance based on a failure to move for acquittal under Crim.R. 29, because "[c]ounsel's failure to make a Crim.R. 29 motion is not ineffective assistance when such motion would have been futile." *Sandifur* at ¶ 47, quoting *Grate* at ¶ 146 (additional citation omitted.). Accordingly, appellant's fourth assignment of error is not well-taken.

20.

## V. Conclusion

**{¶ 51}** Based on the foregoing, we affirm the judgment entered by the Williams County Court of Common Pleas on August 12, 2023. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.
_____
JUDGE

Christine E. Mayle, J.
_____
JUDGE

Gene A. Zmuda, J.
CONCURS.
_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.